No. 22-4015

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

ANNETTE HENRIE,
*Plaintiff-Appellant,*

v.

CARBON SCHOOL DISTRICT,
*Defendant-Appellee.*

---

## ANSWER BRIEF

---

Appeal from a final judgment of the United States District Court for the
District of Utah, Central Division, Civil Action 2:19-cv-00732-DAK,
Honorable Dale A. Kimball, presiding.

J. CLIFFORD PETERSEN
Assistant Utah Solicitor General
Utah Attorney General's Office
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
cliffpetersen@agutah.gov
*Attorney for Appellee*

ORAL ARGUMENT IS NOT REQUESTED

# TABLE OF CONTENTS

Table of Authorities.......................................................................iv

Statement of Prior or Related Appeals.......................................vi

Jurisdictional Statement..............................................................1

Issue Presented.............................................................................1

Statement of the Case...................................................................2

    Henrie's 2015 complaint to the District...............................2

    Henrie's 2016 sexual harassment complaint to the District...........4

    Events after the 2016 complaint...........................................5

    Procedural history and disposition below............................7

Summary of Argument..................................................................8

Argument.....................................................................................10

    The District Court correctly concluded that Henrie was not
      subjected to a materially adverse employment action
      after reporting the alleged sexual harassment......................10

    1.   The 2015 complaint was not a protected activity.................12

    2.   No materially adverse employment actions..........................16

    3.   The district court properly applied summary judgment
       standards...............................................................................20

Conclusion...................................................................................22

ECF Certifications......................................................................22

Certificate of Compliance With Rule 32(a).............................23

Certificate of Service ................................................................24

ADDENDUM A: Written Directive dated January 31, 2017 (App. 205)

ADDENDUM B: Henrie's 2015 complaint (App. 200-04)

# TABLE OF AUTHORITIES

## Cases

*Burlington Northern & Santa Fe Ry.* Co. *v. White*,
   548 U.S. 53 (2006) ..................................................................... 16, 18, 20

*Hatlee v. Olds*,
   665 Fed. App'x 695 (10th Cir. 2016) ................................................... 14

*Jiron v. City of Lakewood*,
   392 F.3d 410 (10th Cir. 2004) ............................................................ 11

*Johnson v. Weld Cty. Colo.*,
   594 F.3d 1202 (10th Cir. 2010) ...................................................... 17, 18

*Navair, Inc., v. IFR Americas, Inc.*,
   519 F.3d 1131 (10th Cir. 2008) .......................................................... 10

*Petersen v. Utah Dep't of Corr.*,
   301 F.3d 1182 (10th Cir. 2002) ...................................................... 11, 13

*Stover v. Martinez*,
   382 F.3d 1064 (10th Cir. 2004) .......................................................... 16

*Stuart v. Erickson Living Mgmt.*,
   822 Fed. App'x 682 (10th Cir. 2020) ................................................... 15

*United States v. Wooten*,
   377 F.3d 1134 (10th Cir. 2004) .......................................................... 15

## Statutes

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

42 U.S.C. § 1983 ........................................................................................ 1

# Rules

Fed. R. App. P. 32(a)(5) ................................................................. 23

Fed. R. App. P. 32(a)(6) ................................................................. 23

Fed. R. App. P. 32(a)(7)(B) ........................................................... 23

Fed. R. Civ. P. 56(c) ...................................................................... 11

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

# JURISDICTIONAL STATEMENT

Annette Henrie sued the Carbon School District (District) under
Title VII, Title IX, and 42 U.S.C. § 1983. The district court had subject
matter jurisdiction under 28 U.S.C. § 1331. The district court granted
the District's motion for summary judgment. Final judgment entered on
January 31, 2022. App. 167. Henrie filed a timely notice of appeal on
March 2, 2022. App. 168. This Court's jurisdiction is based on 28 U.S.C.
§ 1291.

# ISSUE PRESENTED

To make a prima facie showing of discriminatory retaliation under
Title VII or Title IX, a plaintiff must show that: she engaged in
protected opposition to discrimination; she suffered a materially
adverse employment action; and there is a causal connection between
her protected activity and the materially adverse employment action. A
materially adverse employment action means an action that would have
dissuaded a reasonable worker from making a charge of discrimination.
Did the district court correctly grant summary judgment to the District
where Henrie failed to show that she suffered a materially adverse
employment action?

This issue was preserved in the District's motion for summary judgment and ruled on by the district court. App. 73-77, 138-39, 163-65.

## STATEMENT OF THE CASE

Henrie worked for the District. She later sued under Title VII and Title IX, alleging the District retaliated against her for filing a sexual harassment complaint. Though her complaint contained other causes of action, on appeal she challenges only the dismissal of her retaliation claim.

### Henrie's 2015 complaint to the District

In September 2015, Henrie sent a formal complaint to the District complaining about her supervisor, Robert Cox. App. 200-04. Henrie did not mention anything about sex, gender, sex discrimination, or sexual harassment. *Id*. The incidents she complained of didn't implicate gender or sex. She alleged Cox had raised his voice at her about her use of comp time; singled her out for making a mistake; yelled at her about bringing up the issue of comp time; said "derogatory things" about her to staff members; adjusted a day of Henrie's leave; appeared to follow Henrie to lunch; said he was watching people's time reports; and commented about employees who were working from home. *Id*. Henrie

asked for a working environment where she could do her job "without repercussion" from Cox and without having "to put up with his belittling, demeaning[,] and bullying manners." App. 204.

After receiving this complaint, the District's superintendent met with Henrie and Cox separately to discuss the complaint. A resolution was reached and memorialized in writing. Supp. App. 516. The District assigned Henrie a new supervisor, eliminating any need for direct communication between Henrie and Cox. Supp. App. 81, 516. Henrie was permitted the use of an additional room for any time she needed to get away from her office. Supp. App. 97, 516. Henrie was allowed to report directly to the superintendent regarding her leave time. Supp. App. 97, 516. The superintendent also agreed to work on both a job title and a job description for Henrie. Supp. App. 97, 515. A few weeks later, the District moved Cox away from Henrie's office to an office farther away. Supp. App. 277-78. A few months later, when Henrie's new supervisor left, the superintendent took over as Henrie's direct supervisor, so Cox never again acted as Henrie's supervisor. Supp. App. 348-49.

**Henrie's 2016 sexual harassment complaint to the District**

Fourteen months later, on November 8, 2016, Henrie met with the District to lodge a complaint of sexual harassment against Cox. Supp. App. 112. On November 20, 2016, she followed up with a written complaint. App. 206-08. She complained of Cox's alleged "sexual harassment" and "inappropriate sexual actions." *Id*. She described an incident that happened four years earlier, in the spring of 2012, where Cox had allegedly looked her up and down several times, stared at her breasts, and made gyrating motions in his chair. App. 206. She also described several other incidents from 2012 where Cox allegedly looked her up and down. App. 207. And she described an incident from 2012 where Cox allegedly looked down her blouse. *Id*.

She stated that she had not reported this earlier. *See* App. 206 ("I did not report it because it makes me uncomfortable to think about and talk about"); *id*. ("I wouldn't have reported it to the Superintendent"); *id*. ("I thought I could just deal with it by avoiding him and trying to stay out of his office as much as possible"). Shortly before she made the 2016 complaint, Henrie's husband told the superintendent that "there's something [Henrie] hasn't told you . . . . [a]nd I need you to really listen

to her when she tells you this because it's going to be a game-changer."

Supp. App. 307.

**Events after the 2016 complaint**

Henrie claimed that three actions taken by the District after the 2016 complaint constituted materially adverse employment actions against her.

First, Henrie complained that she "began to be excluded from meetings she normally participated in." Aplt. Brf., p. 6. She cited two examples. She said she was not invited to attend special education directors meetings, even though she was not a special education director. Supp. App. 430. On one previous occasion, Cox had asked Henrie to attend a meeting with the special education directors to gather information about what went on at the meeting, but attending those meetings was not a part of Henrie's regular duties. *Id*. Henrie also took exception to missing a UPIPS[1] meeting, even though Cox had

---

[1] UPIPS appears to be an acronym for a special education reporting system, Supp. App. 493, but it is unclear from the record what this acronym stands for, as the acronym was commonly used throughout the depositions without definition. What type of meeting it was is immaterial, other than that Henrie was referring to a type of meeting other than the special educator directors meeting previously discussed.

asked a third party to invite Henrie to the meeting, App. 493-96, and there was no record evidence that the District had intentionally attempted to exclude her from the meeting.

Second, Henrie alleged that she had been training to do Medicaid billing, but after her 2016 complaint she "was suddenly informed that someone else would take her place in the training." Aplt. Brf., p. 6; App. 114. Henrie never did the Medicaid billing; her relevant experience was limited to collecting time studies and providing them to employees tasked with the Medicaid billing. Supp. App. 161-63, 414, 419. In deposition Henrie admitted that she hadn't actually received much training on the Medicaid billing. Supp. App. 163 ("Robert had me working with Sandra to learn the billing piece. I didn't get with them very much because Sandra wasn't ready to step down yet, over the course of a few years."). There was no evidence that Henrie had applied for any actual opening in Medicaid billing. And there was no evidence that Henrie was ever actually assigned billing duties or ever had billing duties taken away from her.

---

*See* Supp. App. 160-61 (Henrie differering UPIPS meeting as different than a special education directors meeting).

Third, Henrie alleged that a written directive she received from the District was an adverse employment action. Aplt. Brf., p. 13. The written directive informed her that it had been reported that she was possibly in violation of district policies by speaking negatively about Cox. App. 205. The directive expressly stated that it was "not a disciplinary letter." *Id*. And it was not placed in her personnel file. *Id*. The directive stated that, if she had indeed been speaking negatively about Cox, this was a possible violation of district policies, and that the conduct needed to "stop immediately." *Id*. It also stated, that if the reports were wrong and Henrie had not been speaking negatively about Cox, then Henrie should disregard the directive and continue doing her job as expected. *Id*.

**Procedural history and disposition below**

Henrie sued the District for, among other things, allegedly retaliating against her for making a report of sexual harassment. App. 7-21. The District filed a motion for summary judgment. App. 33-78, 118-41. The district court granted the District's motion, dismissing Henrie's retaliation claim and all other claims. App. 142-66.

The district court concluded that Henrie had failed to make a

prima facie showing of retaliation. App. 164-65. The district court limited its analysis of Henrie's alleged adverse actions to the period after her November 2016 complaints of harassment. App. 163-64. The district court concluded that Henrie's 2015 complaint was not a protected activity under Title VII and Title IX because Henrie had not said anything in the complaint that would have put the District on notice that any of Cox's alleged actions were motivated by gender or sex. App. 163. The district court concluded that Henrie's first complaint of sexual harassment was in November 2016, when she complained verbally on November 9, 2016, and then when she submitted her formal, written complaint on November 20, 2016. App. 163-64. The district court then concluded that Henrie failed to show that the District took any materially adverse employment actions against her after the 2016 complaint. App. 164-65

This appeal followed.

## SUMMARY OF ARGUMENT

The district court properly granted summary judgment on Henrie's retaliation claim.

Henrie's 2015 complaint was not a protected activity. It contained

nothing that would have put the District on notice that Cox's complained of behaviors were motived by gender or sex. Henrie first complained of sexual harassment in November 2016, so the district court correctly omitted from its retaliation analysis any events before the 2016 complaint.

And the District took no materially adverse actions against Henrie after her 2016 complaint. No adverse action occurred regarding any special education director meetings that Henrie missed because those meetings were only for special education directors, of which Henrie was not one. Henrie did miss a single meeting of a different kind, a UPSIS meeting, but there was no evidence that the District sought to intentionally exclude her from that meeting; the undisputed evidence showed that Cox had attempted to invite her to that meeting through a coworker; in any event, the district court correctly concluded that "no reasonable jury would conclude that one missed meeting is a materially adverse action." App. 165. There was no adverse action regarding the Medicaid billing job because Henrie was never in charge of Medicaid billing, never did any Medicaid billing, and never had any Medicaid billing duties taken away. She collected time studies and gave that

9

information to the employees tasked with the Medicaid billing; there was no evidence that these duties changed after her 2016 complaint.

And regarding the written directive from the District's superintendent, the district court correctly concluded that it was non-disciplinary by its own terms and was not placed in her personnel file. It did not accuse her of wrongdoing or impose any discipline, it merely stated that the District had received reports and *if* the reports of her saying derogatory things about Cox were correct, then she should stop that conduct and do her job.

Because Henrie thus failed to make a prima-facie showing that she suffered a materially adverse employment action after reporting the alleged sexual harassment, the district court properly granted summary judgment to the District. This Court should affirm.

## ARGUMENT

**The District Court correctly concluded that Henrie was not subjected to a materially adverse employment action after reporting the alleged sexual harassment.**

**Standard of Review:**

This Court reviews de novo a district court's grant of a motion for summary judgment. *Navair, Inc., v. IFR Americas, Inc.*, 519 F.3d 1131,

1137 (10th Cir. 2008). Summary judgment is appropriate when, construing the record in the light most favorable to the non-moving party, "there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004); *see also* Fed. R. Civ. P. 56(c).

**Discussion:**

The district court correctly granted the District's motion for summary judgment. To make a prima facie case of retaliation under Title VII or Title IX, Henrie was required to show that: (1) she engaged in protected opposition to discrimination; (2) she suffered a materially adverse employment action; and (3) there is a causal connection between her protected activity and the materially adverse employment action. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). The district court did not reach the third prong of the analysis because it was unnecessary due to Henrie's failure to meet the second prong.

The district court correctly concluded that Henrie failed to demonstrate that the District took any materially adverse action against her after she reported the alleged sexual harassment. Henrie

11

hasn't demonstrated that the district court erred. Henrie's argument on appeal consists of three parts. First, she argues that her 2015 complaint was a protected activity, so the district court erred in limiting its analysis of adverse employment actions to only those events that happened after the 2016 complaint. Aplt. Brf., pp. 10-11. Second, she argues that the district court incorrectly concluded that the events after November 2016 were not materially adverse employment actions. Aplt. Brf., pp. 12-13. Third, Henrie argues that the district court made improper credibility determinations and overlooked factual disputes. Aplt. Brf., pp. 15-16.

None of Henrie's argument has merit. They are addressed in turn.

### 1. The 2015 complaint was not a protected activity

Henrie first argues that her 2015 complaint was a protected activity, so the period for potential adverse actions should run from then instead of only from the 2016 complaint. Aplt. Brf., pp. 10-11. Henrie's argument that the district court "ignored" the "content and language" of the 2015 complaint is patently wrong. The district court examined the plain language of the 2015 complaint and concluded that Henrie failed to "connect sex or gender to her complaints about Cox and

his behavior." App. 163. That is not a hyper-technical reading of the complaint, as Henrie implies. The district court's conclusion is borne out by reviewing the complaint's plain language. The complaint simply didn't mention gender or sex in any way. This much Henrie concedes: "Henrie did not specifically state that Cox's behavior was motivated by gender." Aplt. Brf., p. 11.

But despite this, she nevertheless insists that her "expressing fear of retaliation and loss of job duties should have put the District on notice of the discriminatory conduct and retaliation claims." *Id*. This is a remarkable assertion. Should the District have somehow divined or assumed that sex-based discrimination was underlying Cox's conduct? Henrie cites no authority to support the suggestion that a complaint like the one here—that addresses workplace disputes, management style, interpersonal conflict, and comp time issues without reference to sex or gender—should somehow be interpreted as implicating sex- or gender-based discrimination. Indeed, the position is belied by controlling case law that requires a plaintiff to make a threshold showing that "she engaged in protected opposition to *discrimination*." *Petersen*, 301 F.3d at 1188 (emphasis added). Mere opposition to

nondiscriminatory workplace disputes will not suffice. A plaintiff must actually show that she was in some way addressing sex- or gender-based discrimination. Henrie draws patently unreasonable and illogical inferences from her 2015 complaint to read in a discriminatory aspect that wasn't there. *See Hatlee v. Olds*, 665 F. App'x 695, 699-700 (10th Cir. 2016) (unpublished) ("parties are entitled to only reasonable inferences at summary judgment").

What's more, Henrie's baseless assertion is belied by the undisputed record evidence. In her 2016 complaint, when she did complain of sexual harassment, she admitted she had not reported sexual harassment earlier. *See* App. 206 ("I did not report it because it makes me uncomfortable to think about and talk about"); *id.* ("I wouldn't have reported it to the Superintendent"); *id.* ("I thought I could just deal with it by avoiding him and trying to stay out of his office as much as possible"). Henrie's argument is further belied by her husband's statement to the District shortly before the 2016 complaint. He told the superintendent that "there's something [Henrie] *hasn't told you*." Supp. App. 307 (emphasis added). Henrie connected her complaints to gender or sex for the first time in November 2016.

Henrie also faults the District for not putting on any evidence to counter her assertion that the 2015 complaint was a protected activity. Aplt. Brf., p. 11. Henrie cites no authority to support this argument and doesn't develop the argument beyond her conclusory assertion. That alone should be enough for this Court to reject the argument outright. *See Stuart v. Erickson Living Mgmt.*, 822 F. App'x 682, 684 (10th Cir. 2020) (unpublished) (where appellant makes "conclusory assertions, unsupported by citation to the record or legal authority," this Court "will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation") (quoting *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004)). In any event, there was no need for the District to put on any evidence. There was nothing to refute. The 2015 complaint—cited as evidence—didn't connect Cox's conduct to gender or sex. On its face, the 2015 complaint failed to identify any sexual discrimination or sexual harassment and therefore wasn't a protected activity.

Henrie's mischaracterization of the 2015 complaint is argument, not evidence. So, the District didn't need to submit additional evidence to refute this mischaracterization. The 2015 complaint, itself, is

evidence. And nothing in the 2015 complaint connects Cox's conduct to gender or sex. It was Henrie's burden to make a prima facie case of retaliation. *Stover v. Martinez*, 382 F.3d 1064, 1070-71 (10th Cir. 2004). She failed to meet her burden of showing that the 2015 complaint was a protected activity.

The district court correctly concluded that the operative period for examining allegedly adverse employment actions did not begin with the 2015 complaint. It began with her reports of sexual harassment—both formal and informal—in November 2016. The district court properly considered only the events occurring after those reports.

## 2.    No materially adverse employment actions

To establish a materially adverse employment action, Henrie was required to "show that a reasonable employee would have found that action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68(2006). To determine whether an employment action is materially adverse, it "is necessary to separate significant from trivial harms, . . . petty slights, minor annoyances, and simple lack of

good manners." *Johnson v. Weld Cnty. Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010). "[M]inor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like" do not "form the basis of a discrimination suit." *Id.*

Henrie claimed that three actions after her November 2016 complaint were retaliatory: (1) when she was excluded from certain meetings; (2) when she was told she would no longer receive training to take over Medicaid billing duties; and (3) when she received a written directive from the superintendent in January 2017. Aplt. Brf., p. 6. The district court correctly concluded that none of those were materially adverse employment actions.

First, the meetings Henrie purportedly missed did not constitute a materially adverse employment action. Henrie alleges she "began to be excluded from meetings she normally participated in." Aplt. Brf., p. 6. At deposition, Henrie testified that she was referring to special education directors meetings and to a single UPIPS meeting. Supp. App. 160-61. The undisputed evidence showed that the special education directors meetings were outside Henrie's job duties because she wasn't a special education director. Supp. App. 430-31. So missing

17

any of those meetings wasn't an adverse action. And though Henrie did miss one UPIPS meeting, the undisputed evidence showed that Cox had attempted to invite her to the meeting through a coworker (since he thought he wasn't supposed to contact her directly). App. 493-96. Henrie presented no evidence below to create a material question of fact on whether Henrie was intentionally excluded from the UPIPS meeting.

In any event, the district court aptly concluded that "no reasonable jury would conclude that one missed meeting is a materially adverse action." App. 165. Indeed, a single missed meeting is, at most, a "minor" or "trivial employment action" that cannot "form the basis of a discrimination suit." *Johnson*, 594 F.3d at 1216. It is unlikely that a single missed meeting, especially when there's no evidence that Henrie was intentionally excluded, would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 60.

Second, the District took no materially adverse employment actions regarding the Medicaid billing. The undisputed record evidence showed that Henrie was never in charge of Medicaid billing. Supp. App. 480. She was assigned to only collect time study information and give it

18

to the workers who were actually tasked with the Medicaid billing. *Id*. Henrie conceded this was her role. Supp. App. 161. Henrie may have *wanted* the role of Medicaid billing and even subjectively expected to get it at some point in the future, as well as expected to eventually get fully trained for it, but the undisputed evidence showed that she never performed the role or had it taken from her. Supp. App. 480, 161. As to the training piece, she admitted at deposition that she didn't actually receive much training to do the billing. Supp. App. 163. There was no record evidence that Henrie had even applied for any actual job opening in Medicaid billing. And there was no evidence that Henrie had any experience doing Medicaid billing, was ever actually assigned Medicaid billing duties, or ever had Medicaid billing duties taken away from her.

Third, the written directive was not a materially adverse employment action. The directive informed Henrie that it had been reported that she was possibly in violation of district policy by speaking negatively about Cox. App. 205. The directive expressly stated that it was "not a disciplinary letter." *Id*. The directive was not placed in her personnel file. *Id*. The directive stated that, if Henrie had indeed been speaking negatively about Cox, this was a possible violation of district

policies, and that the conduct needed to "stop immediately." *Id*. It also stated, that if the reports were wrong and Henrie had not been speaking negatively about Cox, then Henrie should simply disregard the directive and continue doing her job as expected. *Id*. The directive did not cause any change in Henrie's employment status or job duties.

Given all of this, Henrie fails to explain why the directive would "have dissuaded a reasonable worker from making or supporting a charge of discrimination*Burlington*, 548 U.S. at 64. Though Henrie points out that the directive referred to possible policy violations (including parenthetical references to a policy entitled "Causes for Dismissal"), the directive didn't threaten dismissal or any other discipline. Nor did it state that Henrie was being investigated for the allegations or that she was being formally charged with misconduct. It merely stated that, *if* the allegations were indeed true, Henrie should stop spreading negative information. App. 205.

### 3.    The district court properly applied summary judgment standards

Finally, in the closing section of her brief, Henrie makes several cursory arguments challenging the district court's summary judgment ruling. Aplt. Brf. 15. But none of these arguments demonstrates that

20

the district court erred or otherwise applied incorrect summary judgment standards. Henrie asserts that the district court made credibility determinations, but she fails to specify what those determinations were and fails to engage in any discussion about them. Aplt. Brf., p. 15 (single sentence regarding credibility determinations). She also asserts the "evidence . . . created a dispute of fact." *Id*. But she doesn't identify what factual dispute was created, or what evidence created it, and fails to include any discussion in support of her conclusory assertion. *Id*.

Henrie also asserts that the district failed to construe the evidence in the light most favorable to her as the non-moving party. *Id*. In support of this argument, she concedes that the 2015 claim had no "specific language tying it to gender," yet insists that it contained "several phrases and events that made it a protected activity." *Id*. But she wholly fails to identify what those phrases or events were, and she fails to discuss why any specific phrases and events would make the complaint a protected activity in the absence of anything that remotely suggests that Cox was motivated by gender or sex. *Id*. And, as discussed above, the undisputed record evidence—including Henrie's own written

statement—showed unequivocally that Henrie never report any sexual harassment to the District before November 2016. *See* App. 206 (Henrie stating that "I did not report it because it makes me uncomfortable to think about and talk about").

The district court properly applied the summary judgment standards to the undisputed evidence to conclude that the 2015 complaint was not a protected activity, as discussed in section 1, above.

## CONCLUSION

Because Henrie didn't suffer any materially adverse employment actions after reporting the alleged sexual harassment, the district court correctly concluded that Henrie failed to make a prima facie showing of retaliation. Summary judgment was proper. This Court should affirm.

Dated this 1st day of September, 2022.

 */s/ J. Clifford Petersen*
J. Clifford Petersen
*Attorney for Appellees*

## ECF CERTIFICATIONS

Pursuant to Section II(J) of the Court's CM/ECF User's Manual, the undersigned certifies that:

1.      all required privacy redactions have been made;

2.      hard copies of the foregoing brief required to be submitted to the clerk's office are exact copies of the brief as filed via ECF; and

3.      the brief filed via ECF was scanned for viruses with the most recent version of Microsoft Security Essentials v. 2.1.111.6.0, and, according to the program, is free of viruses.

Dated this 1st day of September, 2022.

/s/ J. Clifford Petersen
J. Clifford Petersen

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4868 words, excluding those parts of the brief exempted by the Rule.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in New Century Schoolbook 14-point font (headings in 16 point, footnotes in 14 point).

Dated this 1st day of September, 2022.

/s/ J. Clifford Petersen
J. Clifford Petersen

## CERTIFICATE OF SERVICE

I hereby certify that on September 1st, 2022, this brief was electronically filed using the Court's CM/ECF system, and that system was used to serve all parties and counsel of record:

Andrew W. Stavros
Andrew Fox
STAVROS LAW P.C.
andy@stavroslaw.com
fox@stavroslaw.com


/s/ J. Clifford Petersen

# ADDENDUM A

Written Directive dated January 31, 2017 (App. 205)

# ADDENDUM A

Written Directive dated January 31, 2017 (App. 205)

# ADDENDUM A

Written Directive dated January 31, 2017 (App. 205)

**Carbon School District**
*making connections with the world*
251 West 400 North Price, UT 84501 435 637-1732
www.carbonschools.org

*Original given in an envelope of 1-31-17.*
*SC*

January 31, 2017

Annette,

It has come to my attention that you have been speaking negatively about Robert Cox, to other teachers in the District. This needs to stop immediately. Several employees have reported that your communication is making them uncomfortable. Moreover, such communication is in violation of several district policies, including prohibitions against insubordination, unprofessional conduct, and failure to maintain an effective working relationship with colleagues. (District Policy DM, paragraphs 2, 8, and 19 under "Causes for Dismissal"). I'm well aware of the conflicts you've had with Mr. Cox, but it is highly unprofessional for someone in your position to speak negatively about your superior to others over whom Mr. Cox has supervisory authority. Additionally, I have been informed that, due to the communications about Mr. Cox, you are not fulfilling your responsibility to help these teachers with their IEPs, another violation of district policy ("Failure to fulfill duties or responsibilities", District Policy DM, paragraphs 15 under "Causes for Dismissal".)

This letter is a directive to stop spreading negative information about Mr. Cox immediately and focus on assisting teachers and other special education personnel with their IEPs, as part of your job responsibilities.

If you believe I have received inaccurate information and you have not been speaking negatively about Mr. Cox and have been working on IEPs, then please continue to do your job as expected.

This letter is a directive and not a disciplinary letter. It will not go into your permanent personnel file.

Thank you.

Steve Carlsen
Superintendent
Carbon School District

CARBON COUNTY SD 000017
1326.4256

# ADDENDUM B

Henrie's 2015 complaint (App. 200-04)

# ADDENDUM B

Henrie's 2015 complaint (App. 200-04)

# ADDENDUM B

Henrie's 2015 complaint (App. 200-04)

September 13, 2015,

To: Steve Carlsen
Superintendent, Carbon School District

RE: Formal Complaint

Dear Steve Carlsen

I am writing this letter as a formal complaint, in regards to the treatment of me by my immediate supervisor, Robert Cox. This has been an ongoing problem for some period of time now. This problem has caused me extreme anxiety, tension and emotional distress. It has resulted in my need for mental health counseling and medication to deal with the environment I am working in. In bringing this to your attention I hope that we can deal with this issue quickly and amicably.

The latest instance that prompted me to come to your office occurred on Sept. 10th 2015 (Thursday), during our Opening Sped meeting. On this particular day Robert was asked a question by a sped teacher during his part of the meeting. He attempted to answer the question. I tried to ask if I could interject to clarify but he refused to allow me to answer the question. I felt he was trying to keep me from speaking in the meeting. After Robert was done with his portion of the meeting it was my turn. When I was being asked questions by sped teachers, as I would begin to answer Robert would jump in immediately cut me off so that I was unable to answer questions being posed. He did this to me approximately 4 or 5 times. This became apparent to me that he was making sure he had the floor and was holding me back from answering questions. My thoughts were, "Why am I up here if he is just going to overpower me." I felt belittled and demeaned in front of my colleagues. I felt he was bullying me by showing me who was the boss and making it apparent for the sped teachers to see. The anguish became too great. I couldn't keep my composure in front of my peers and I walked out of the meeting leaving my colleagues hanging. Upset and not knowing where to go and unable to get to my personal belongings due to Roberts proximity, I ended up in your office. Please know there has been other events prior to this episode of me breaking again.

On Sept. 11th I was informed by the teacher, who asked Robert the question he struggled answering in the meeting. I was told that he wanted to know what she was thinking when she asked the question. She told him that it had been answered when we were in the tech. lab later on Sept 10th by me. He told her to pretend that she hadn't talked with me about this question and they would discuss it now. 5ee reviewed testing data with him and explained why a sped student should be served or not served. He told her he would send out an email to sped teachers about what they had come up with and that he would make sure it was decided by him and her. I feel he is now going into the field demeaning me with my colleagues and undermining the instructions I have given.

**200**

CARBON COUNTY SD 000001
1326.4256

When Robert first took over Sped I felt we had a great working relationship. He turned me lose to run Sped with the understanding to do what was necessary and not to worry about stepping on his toes. Initially, Robert and I would meet regularly and discuss any issues, concerns, the day to day running, of Sped. This seemed to change when Heather took over as his Secretary. During her transition it had been discussed that she would be shared and continue with duties she was assisting me with. Soon after she assumed the Secretary position she came to me and indicated she was too busy to continue doing certain duties for me. In a conversation with the three of us present Robert made it clear to me that she was his secretary. At this point I assumed there was no need to discuss shared duties and therefore I assumed the duties she had been assisting with up to her transition, with the exception of scoring ancillary testing.

For the Opening Sped meeting of 2012 I prepared the agenda and had Heather and Robert review for errors, additions, changes etc. They both confirmed it was good no changes needed. At the beginning of the meeting Robert was announcing the staff changes. He made it a point to focus on me and stated that he couldn't believe Heather's previous supervisor had forgot her. He then let the staff know she had changed to the Sped secretary. I was extremely embarrassed in front of my colleagues, and was approached by a few if I was okay during the break by what he had done. This episode caused a wedged in our working relationship.

In the spring of 2014 I was leaving early from work to go out of town and tried to catch Robert in his office to let him know. I was unable to connect with him so I let Heather know so she could convey the message. When I returned I was informed by Heather that he got very upset in front of Kim and herself. She stated he said some really bad things about me but she refused to repeat them. I was appalled that he would act in this manner, and say derogatory things about me in front of my staff, especially without addressing me if there was a problem.

Approximately two weeks later, Heather stated Robert is watching people's time and commenting on them working from home and that he has spoken to everyone about this. I told her that Robert has not said anything about this to me. I was upset that Robert would address this with Heather instead of addressing it with me if it was an issue. I let her know I would talk with Robert about this but she became very upset and didn't want me to pursue this with Robert. I felt this was unprofessional that my supervisor and the HR director would talk about my time with Heather which is personal information.

Prior to this time I have had conversations with Robert to make sure my bases were covered as to my time. I was told that I could do whatever I needed just keep it documented. I have offered on many occasion to provide him with documentation. He has always told me he didn't need it.

I was called on Oct. 3rd for taking the day office – Robert asked Heather to call. I had not yet turned in a leave slip. I was trying to be discreet with Heather about this day because Robert didn't want it to be common knowledge that we comp time. I tried to tell her that I was on my phone and I needed to look at my calendar. She mentioned that Robert said he would just turn

CARBON COUNTY SD 000002
1326.4256

my slip in and sign my name to it. I then told her to tell Robert that I had adjusted the day and to let him know I would get with him when I came back to work as I was home sick. She let me know Robert said he would just turn in a time slip for me and I then told her to let him know I adjusted it off again. The day in question I actually adjusted off for time I had worked prior. I attended the Sped Law Conference and instead of turning in for pay for the day I adjusted that day off.

When I returned to work, I sent him an email about the time. On Oct. 16th Robert came into my office, red in the face and appeared agitated. He stated he didn't understand my email. I tried to explain what I had done with my time and he stated in a raised intimidating voice that "no one comps off time in this district with the exception of Patty Rigby!" I asked what does this have to do with me we have been doing this for years and he stated there is a misunderstanding and you are not allowed to do this. He continued and said that I was on a contract if the job takes 16 hours a day then you will work 16 hours a day. I tried to explain that I have taken on additional duties with the understanding that I had the ability to be flexible to meet timelines to get the job done. He said if you are gone an hour you will turn in for an hour. In previous conversations he had stated it's known, that if you have a hair appointment it is an emergency and you just go. I felt threaten by his demeanor and was overwhelmed and hurt by his actions. He made me feel as if I had been doing something I shouldn't have been doing for years. I called my husband to come get me from work as I was so upset to control my emotions.

After the holiday break I had a conversation with Robert regarding Sped items. It is common knowledge that you watch for when Robert is having a good day to approach him on matters. He appeared to be in good spirits and I felt I could try and address my time issues with him again. I felt I owed him the courtesy to try and work this out. I stated I need to talk about work and my time. He immediately raised his voice again to an intimidating level and stated "I told you we do not comp time in this district". He went on how Heather could take on more duties. I tried to explain that she had come to me and was trying to push duties off on me. He said he talked to her and she said she will do more. Robert made me feel like anything I was trying to say was untrue and of no value. I then mentioned to Robert that I had had a conversation with a person the night before and that they indicated, with Robert's permission, they were able to comp time off. He stated she wasn't going to that conference anymore. I advised I spoke with her just the day before and she was going. He commented "well that was a onetime thing Annette". He made it appear that he was badgering me and directing this specifically at me and my time, since I'm aware there are others in the district who comp time. He also brought up that his problem is "He doesn't see me and people are asking him if I still work there". I advised I've been working in the field with the new sped teachers and we have more this year than in the past. He knew prior I would be in the field more with the teachers and yet he jumped me on this. He stated they are highly qualified and that I was spending too much time with them. Prior to this year he has never been on me about what I'm doing or my time... He has always

<u>202</u>

let me do my job without interference. If there was any question he could have simply called me and asked about my time. I have never tried to hide what I am doing.

Not too long after this I met with you, Superintendent Carlsen and Principal Mica Salas in her office at HMS. I attempted to express my total frustration and anxiety, and that I was completely overwhelmed that he would attack me many times regarding my work and time when I have had free reign since I have been working under him. You acknowledged I was concerned about my time, when I should have also asked that his actions be address concerning me being bullied, intimidated and left with a feeling of total mistrust in the work place.

A meeting was arranged between the three of us, Superintendent, Robert and myself. You needed to leave early for a meeting. When I left I was totally frustrated and confused about the time issue. I felt that Robert spoke in circles and I still had no idea of how I was to handle my time.

Shortly after I discovered my time loss of the day Robert had turned in for me. Again, I was totally bewildered and confused that Robert would just take my day after he was told it was adjusted off and did not try to discuss this with me. At this point I was agitated and pissed that he treated me as if I was not truthful on my time. This shows a total lack of respect and distrust for me, when I have never given him reason to distrust my professionalism. I felt that he was challenging my integrity. This could have been solved easily had he just communicated with me in a civil manner. Instead he used his authority to show me he could just take the day.

Towards the end of the year I wanted to take our testers to lunch to show the gratitude of the sped department. I was leaving to go to lunch and as I was coming around the board office I noticed Robert in a very quick pace going to his vehicle. As I went to my lunch destination it appeared that he was following me. I have been told by another teacher that, he and Judy sometimes follow people to catch them. I was astounded and upset to feel that he was following me. I felt in a state of panic and shock that he would suspect me to do anything other than my job. I felt that I disrupted the luncheon for these ladies because I was so upset.

Not long after this Robert made statements across the hallway to Heather that if he gets another phone like the one he just got he would retire and then Annette could run sped. I felt he emphasized my name and said it loud enough for not only me but others to hear. I felt like he was taking stabs at me. I have never tried to take his job from him, even though there have been numerous conversations that a sped coordinator position would be created when either Judy or Joan retired. This is why I felt he was sending me to the directors meeting so that when this happened I would be up to speed. In fact at one meeting I was approached and congratulated on the position, I had to quickly correct this. Which was very uncomfortable for me.

This year had caused me such anxiety, paranoia, and stress in my working environment, I just felt that if I could make it through the end of the year, I would have the summer to recover and

CARBON COUNTY SD 000004
1326.4256

hit it head on this next year. A situation on the last day of school not involving Robert, resulted in me feeling the need to involve the union. Things I thought were being worked on about civility, my environment and my job description to be resolved at the beginning of this school year.

I felt this year has started with me feeling total anxiety and stress that I walked into unresolved issues. When Robert treated me with such lack of appreciation, respect, gratitude, and the manner in which he belittled, bullied and demeaned me in front of my peers in our opening sped meeting, I decided I could not have another year like last year. I became even more concerned when Robert pushed his way into the Superintendents office because he had one thing he needed to say to me. His apology he gave lacked sincerity and empathy from my point of view and that he was only going through motions.

Resolution that I am seeking:

I want a working environment where I can do my job without repercussion from Robert. In an setting where I don't have to put up with his belittling, demeaning and bullying manners.

I need my job description set and defined where I know I'm not crossing paths over Robert or him over me. It should also, be fair and equitable where my duties are not striped because I have complained about Roberts actions.

I need an environment where I feel safe and I want to come and not worry he will retaliate.

I hope that we can come to an agreement that will include these resolutions.

Thank you for your time and consideration

*Annette Henrie*

Annette Henrie

204

CARBON COUNTY SD 000005
1326.4256